J-A05015-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2179 EDA 2020 |

Appeal from the Order Entered October 22, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000549-2020

BEFORE:   OLSON, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                    **FILED:  JUNE 7, 2021**

C.B. ("Mother") appeals the adjudication and disposition order entered on October 22, 2020, that:  found Mother had abused her male child, L.B., ("Child") (born in June 2018); adjudicated Child dependent; removed Child from the home of Mother and L.J. ("Father") (collectively, "Parents"); and, placed Child in the legal and physical custody of Philadelphia Department of Human Services ("DHS"), with the permanency goal of reunification with Parents.[1]  We affirm.

On May 19, 2020, DHS filed a petition for emergency protective custody alleging that, on May 4, 2020, DHS received a General Protective Services

---

[*] Former Justice specially assigned to the Superior Court.

[1] In a separate October 22, 2020 order, the trial court found aggravated circumstances existed as to Mother.  42 Pa.C.S. § 6302(2).  Mother did not file a notice of appeal from the aggravated circumstances order.  Father did not file a notice of appeal with regard to any of the October 22, 2020 orders.

("GPS") report which stated Child had a fractured femur on his left leg, for which Parents took Child to the hospital for treatment on May 2, 2020. The trial court placed Child and his older half-brother, J.B., who was four years old (born in 2016) (collectively, the "Children"), in the care of Child's paternal uncle, K.J. ("Paternal Uncle"). On May 20, 2020, the trial court held a shelter care hearing. On that same date, the trial court entered a shelter care order finding that: continuation of Child in Parents' home was not in Child's best interest; as of May 19, 2020, Child was safe and in a foster home through First Choice Home and Community Services; to allow Child to remain in Parents' home would be contrary to his welfare; and, DHS made reasonable efforts to prevent or eliminate the need for removal of Child from Parents' home. The court transferred legal and physical custody of Child to DHS, and directed that Parents were to have supervised visits. The order provided the caregiver could supervise the visits if the caregiver consented. The trial court lifted the order of protective custody, directed that the temporary commitment of Child would stand, and directed DHS to explore placement with Father.

On May 27, 2020, DHS filed a dependency petition and requested that the trial court: adjudicate Child dependent pursuant to 42 Pa.C.S. § 6302(1); find child abuse against Mother pursuant to 23 Pa.C.S. § 6303(b.1)(1); and,

find aggravated circumstances against Mother pursuant to 23 Pa.C.S. § 6303(b)(1).[2] DHS alleged:

> [5]b. On May 24, 2018, DHS received a [GPS] report alleging that Mother was seven months pregnant and due to give birth in July of 2018; that [Mother] was abusing Percocet, marijuana, and cigarettes; that [Mother] was using drugs around [J.B.]; that [Mother] was selling her food stamps for drugs and other things; that [Mother] was violent and aggressive; that [Mother] spent one week at a rehabilitation facility eight months prior to the report; that Mother stayed one week at a rehabilitation facility and then left the facility; that [J.B.] was very hyperactive; that [Mother] suffered from bipolar disorder and anxiety; that [Mother] was not taking her medications; and that [Mother] yelled at [J.B.] and hit him. DHS determined the report was valid.

> c. On June 30, 2018, DHS received a GPS report alleging that [Mother] had given birth to [Child in June 2018] and Mother and [Child] tested positive for marijuana upon delivery; [that] Mother was reported to have had little to no prenatal care; that [Mother] stated she was around marijuana but did not smoke marijuana; that [Mother] stated she was likely to miscarry so she had stopped going to prenatal appointments; that [Child] was healthy and scheduled to go home on July 1, 2018, pending DHS' clearance; and that [Mother] stated that she had what she needed to care for [Child]. This report was determined to be valid.

> d. The family was subsequently referred for services through the Rapid Service Response Initiative ("RSRI"). The case was not accepted for services by DHS at that time[,] and DHS closed the investigation.

> e. On May 4, 2020, DHS received a GPS report alleging that [Child] was in the care of [Mother]; that [Mother] had left [Child] on a bed with her paramour, [Father], and went into the bathroom; that when [Mother] returned to the room, [Child] was crying and his leg was swollen; that [Child] had an unexplained

_____

[2] In its October 22, 2020 adjudication and disposition/abuse order, the trial court found that DHS sustained its burden of proof as to the allegations in the dependency petition, adopting those allegations as its findings of fact.

left femur fracture; and that [Child] had no other fractures identified on babygram of the bilateral legs. This report is pending determination.

f. On May 4, 2020, DHS visited the family at St. Christopher's Hospital for Children. [Mother] stated that [Child] had been crying and that she picked [Child] up and placed him on her bed. [Mother] later stated that [Child's] leg may have become intertwined in the bunk bed where he was sleeping. [Father] stated that he heard [Child] crying, but that it sounded like normal crying. [Maternal Grandmother], who also resided in the home, stated that Child's leg was very sensitive[,] and that she thought Child should be taken to the hospital. It was determined that [Child] would reside with [Paternal Uncle], with a Safety Plan.

g. On May 5, 2020, DHS evaluated the home of [Paternal Uncle] and found it to be appropriate. [Paternal Uncle] passed all necessary background checks.

h. On May 5, 2020, [Child] was discharged from St. Christopher's Hospital for Children to the care of [Paternal Uncle].

i. On May 6, 2020, DHS evaluated the home of [Mother] and found it to be appropriate.

j. On May 15, 2020, [Child] was evaluated at St. Christopher's Hospital for Children. [Child's] leg was healing well, and no other broken bones or healing bones were found on the [x]-rays.

k. On May 18, 2020, it was determined by DHS that [J.B.] was at risk in the home with [Child]. [J.B.] began residing with [Paternal Uncle] with a Safety Plan.

l. On May 19, 2020, a final report from St. Christopher's Hospital for Children stated: "[Child's] leg injury is the result of a combined compressive with twisting/bending force applied to the bone. If [Child's] leg was injured in the manner which [M]other described, then she was using excessive force when she removed [Child] from his bed. It is important to note that she does report that [Child] was throwing a tantrum at the time she was trying to lift him from the bed, and so this becomes a worrisome scenario where she was potentially using this excessive force out of frustration with [Child's] behavior. A child who breaks his femur

- 4 -

will immediately show symptoms at the time the injury happens. A fracture to the femur would be an injury that is extremely painful. Although [M]other reports that [Child] was crying/whining prior to being lifted from the bed, she does not report any change in the way he was crying (i.e.[,] crying more) or that he exhibited significant pain symptoms. This symptom history does not coincide with what would be expected with a femur fracture. Therefore, [M]other is either minimizing his symptoms or there is another injury event that caused [Child's] injury, which [P]arents have not reported."

m. On May 19, 2020, DHS obtained a OPC [("Order of Protective Custody")] for J.B. and [Child]. [J.B.] and [Child] were placed in foster care through First Choice Home and Community Services.

n. On May 19, 2020, [I.A.], the father of [J.B.], contacted DHS concerning [J.B.]. I.A. was directed to appear at the shelter care hearing on May 20, 2020.

Petition for Dependency and Aggravated Circumstances, 5/27/20, at 1-3

(unpaginated).

Further, in the petition, DHS stated:

o. At the shelter care hearing held on May 20, 2020, the [c]ourt lifted the OPC and ordered the temporary commitment to DHS to stand. An evaluation of the home of [J.B.'s] father, [I.A.], was ordered. DHS was ordered to explore [I.A.] as a placement resource. If the home was found to be appropriate and clearances approved, the [c]ourt ordered that [J.B.] may be reunified with [I.A.] prior to the next court date. Family Finding for [Child] was ordered. Supervised virtual visitation was to be arranged. [J.B.'s] and [Child's] dependent matters return to court on June 23, 2020 in Courtroom 4D.

p. On May 20, 2020, DHS assessed the home of [I.A.] and found it to be appropriate. [I.A.] passed all necessary background and clearances.

q. On May 20, 2020, [J.B.] was reunified with [I.A.], where he currently remains. [Child] remains in foster care through First Choice Home and Community Services.

r. DHS has determined that there is a sufficient basis to find that aggravated circumstances exist pursuant to 42 Pa.C.S. § 6302 (aggravated circumstances (2)).

s. [Child] sustained an unexplained left femur fracture while in the care of his parents, [Mother] and [Father], on or about May 4, 2020. The final medical report from St. Christopher's Hospital for Children regarding [Child's] injury stated that "[Child's] leg injury is the result of a combined compressive with twisting/bending force applied to the bone."

t. Father has a history of convictions and incarceration for theft.

u. [I.A.] has a history of convictions and incarceration for theft, conspiracy, and driving under the influence of drugs and/or alcohol.

v. [Mother] may have substance abuse concerns and undiagnosed mental health concerns. [Mother] is not currently receiving any treatment.

w. DHS is recommending that [Child] be committed to [DHS].

6. The following services and/or referrals have been offered, provided and/or considered to enable the parent to care for this child: HIS/FSS; RSRI, parent training, mental health services, substance abuse treatment. In-home services will not reasonably eliminate the risk of harm to the child because the mother may have mental health and substance abuse concerns and the child suffered serious unexplained injury in the care of the parents.

Petition for Dependency and Aggravated Circumstances, 5/27/20, at 3-4 (unpaginated).

On July 2, 2020, the trial court held an initial adjudicatory hearing. Present at the hearing via videoconference were: DHS's counsel, Attorney Kelly Conway; Father's counsel, Attorney Janice M. Sulman; Child's guardian

*ad litem* ("GAL")/legal interests counsel, Attorney Joshua Weil; and Mother. In an order entered on July 2, 2020, the trial court found that Child was placed in foster care through the Community Umbrella Agency ("CUA") Turning Points for Children ("Turning Points"), and Child was safe in his foster home as of June 3, 2020.[3] The court deferred the dependency adjudication to August 25, 2020, and continued Child's temporary commitment to DHS. Further, the trial court appointed Attorney Elizabeth Larin to represent Mother, and continued Attorney Weil as GAL/legal interests counsel for Child. The court appointed Attorney Aaron Fineston to represent Father, vacating the appointment of Attorney Sulman.

On August 25, 2020, the trial court held the adjudicatory hearing, at which Mother and Father were present with their counsel, as was the GAL/legal interests counsel. Child's foster father, T.M., ("Foster Father"), and Child's foster mother, E.M., ("Foster Mother") (collectively ("Foster Parents")), were also present. DHS presented the testimony of Norrell K. Atkinson, M.D., the attending pediatrician at St. Christopher's Hospital for Children ("St. Christopher's") who treated Child on May 4, 2020. Dr. Atkinson testified as a stipulated expert on child abuse (N.T., 8/25/20, at 17). DHS also presented the testimony of Tanajie Wallace, a DHS social worker/investigator assigned to the case (*id.* at 65); and Taneisha Spain, the CUA Turning Points case

---

[3] On June 3, 2020, Child was transferred to a third foster care placement. N.T., 8/25/20, at 111-112.

manager assigned to the case since May 22, 2020 (*id.* at 96). DHS had a number of exhibits admitted into evidence, as did Mother.

Dr. Atkinson testified Child had been admitted to St. Christopher's on May 2, 2020, and, two days later, on May 4, 2020, she assessed Child and met with Parents. N.T., 8/25/20, at 19-20. When Dr. Atkinson saw Child, his leg was in a cast, but she reviewed x-rays of Child's leg. *Id.* at 22. Mother initially reported she had left Child on the bed with Father while she went to use the bathroom, and, when she returned, Child was crying. *Id.* at 20-21. Mother reported she had tried to pick up Child to console him, but he continued to cry. *Id.* at 21. Mother walked around with Child and took him outside to see the dogs next door, which usually calms him, but he continued to cry, and then Mother noticed his leg was swollen. *Id.* When Mother touched Child's leg, Child seemed to cry much louder, and she noticed that his leg was swollen and disfigured. *Id.* Mother then took Child to a hospital to have his leg evaluated. *Id.*

Dr. Atkinson testified that none of Parent's explanations truly explained the injury to Child's leg. *Id.* Parents did not report any history of a fall or injury involving Child occurring on May 2, 2020. *Id.* Parents reported Child had fallen from a chair two days earlier but, afterwards, was fine and using his leg and walking, so Dr. Atkinson did not believe that the fall caused the injury to Child's leg. *Id.* Mother reported something might have happened to Child's leg as she moved him from his own bed to Parents' bed, but she did

not notice anything different about Child's leg or that Child was in any discomfort around the time that she carried him. *Id.* at 21-22. Mother simply reported she observed Child crying when she came out of the bathroom, with no direct trauma or injury history. *Id.* at 21-22.

Dr. Atkinson testified an event would have been necessary for Child to fracture his left femur, as force is required to break a femur, one of the strongest bones in the body. *Id.* at 22-23. Child had an oblique fracture to the mid-shaft of his left femur, and the injury was new. *Id.* Dr. Atkinson testified the injury to Child's femur would have required a "good amount of force," as Child had healthy bones, and would not happen during normal play or from a normal accident. *Id.* at 23-24. It could possibly happen from a fall of a good deal of height from a trampoline or a high bunkbed or running with a resulting twist of the leg. *Id.* Initially, Parents did not provide any history or symptoms that would be consistent with an injury to Child's femur. *Id.* at 23-24. Child's cast was placed from his hip and down his leg. *Id.* at 25. The injury impaired Child's ability to walk. *Id.* Dr. Atkinson testified Child's leg healed, but physical therapy is required after this sort of bone injury heals. *Id.*

After Dr. Atkinson wrote her initial May 4, 2020 report, she gained additional information, and, on May 19, 2020, she wrote an addendum to her report. *Id.* at 25-26. DHS informed Dr. Atkinson that Mother subsequently reported to DHS that Child had been sitting in his bed, which was a bunkbed

situated next to Parents' bed. *Id.* at 26. Child was sitting with his face toward the foot of the bed, and his legs were in between two slats of the footboard of the bunkbed. *Id.* Child was throwing a tantrum, flailing his body back, and Mother was trying to pick him up off the bed. *Id.* Mother reported that she could have caught his left leg in the slat on the footboard as she was trying to get him off the bed. *Id.* This was the first time Mother provided information regarding a tantrum. *Id.*

Dr. Atkinson opined that, it is possible that the injury could have occurred in the manner that Mother described if Child's leg had been caught between the slats of the footboard, and if Mother used a significant amount of force to remove him from the slats. *Id.* However, Mother did not report any change in the amount of crying and whining that Child was making during his tantrum and when she was pulling him out of the bed. *Id.* at 27. Dr. Atkinson testified that Child's leg injury would have caused him immediate pain, and there would have been a notable change in the way he was crying, such that his caregivers should have been aware that the injury occurred. *Id.* She opined that, either the manner of the injury that Mother described involving the slats in the footboard was not the event that caused Child's fracture, or Mother was minimizing Child's symptoms and how Child was acting after the event. *Id.*

Dr. Atkinson stated Mother provided this footboard explanation to DHS as the manner in which she assumed the injury occurred, but she reported

only that Child was crying more when she came out of the bathroom, as opposed to reporting that Child was crying differently from when she pulled him off his bed. *Id.* at 27-28. Father was present when Mother was trying to pull Child off the bunkbed. *Id.* at 28. Dr. Atkinson testified it was possible that the event occurred in another manner. *Id.*

Dr. Atkinson testified Parents did not name any other caregivers for Child when the injury occurred. *Id.* at 28-29. Father did not have anything additional to report to DHS regarding Child's injury. *Id.* at 29. Dr. Atkinson provided her expert opinion that, if Child were injured by Mother's pulling him out of the footboard slats and he was throwing a tantrum, then Mother used a degree of force beyond that which is appropriate for a twenty-two-month-old child. *Id.* at 30-32. Dr. Atkinson was also concerned that Child was throwing a tantrum during the event, and so Mother potentially used excessive force out of frustration when she was trying to remove Child from his bed. *Id.*

On cross-examination by GAL/legal interests counsel for Child, Dr. Atkinson testified that she received the information regarding Mother's second rendition of how Child was injured from Mother's own words spoken during Mother's video reenactment of the event conducted by DHS. *Id.* at 34-35. She was not aware of any history of abuse of Child, nor did she observe any external signs of injuries other than the femur break. *Id.* at 35-36. Dr. Atkinson also stated that many times, with children who have been abused through being hit or punched, there is no external sign of the injuries. *Id.* at

36. In Dr. Atkinson's expert opinion, Child could have been injured if his leg were stuck in the slats of the footboard, but it would have required excessive force in lifting Child out of the bed to cause his injury, and Child would have been crying when it happened. *Id.* at 36-37. She is concerned about the amount of force a caregiver would have used for the injury to have occurred as Mother described, and that the caregiver should have noticed the symptoms at the time that Child's leg was injured. *Id.* at 37-39.

On cross-examination by Mother's counsel, Dr. Atkinson testified that it was her clinical experience and expert opinion that a parent knows when his or her child breaks his leg. *Id.* at 52. She also testified that, in her field of expertise and clinical experience, it is a known fact that there are certain triggers that could cause a parent to hurt a child or use more force on a child than needed. *Id.* at 56-57. Dr. Atkinson testified that a child throwing a tantrum can be a frustrating situation that would cause the parent to use more force than needed. *Id.* Dr. Atkinson would expect Child would have cried more than Parents reported to DHS if he were injured when Mother pulled him off the bunkbed. *Id.* at 57-58. She is concerned that Parents did not accurately report to DHS Child's symptoms from his injury. *Id.* at 58.

On cross-examination by Father's counsel, Dr. Atkinson testified that Child would not have been injured from being lifted off the bed with a normal amount of force. *Id.* at 60. She opined that a high degree of force would have been needed to dislodge Child from the slats of the footboard, not simply

a normal amount of force, but she could not quantify the amount of force required to injure Child. *Id.*

Next, DHS presented the testimony of Ms. Wallace, the DHS social worker/investigator assigned to the case. Ms. Wallace testified that the family first became known to DHS in a GPS report dated May 24, 2018, stating that Mother was abusing substances while pregnant, and that she was being violent and aggressive toward J.B. *Id.* at 65. DHS determined that the report was valid. *Id.* In June of 2018, DHS received another GPS report stating that Mother tested positive for marijuana during her delivery of Child. *Id.* at 66. DHS determined that the report was valid, and Mother was the responsible party. *Id.*

On May 4, 2020, DHS received another GPS report that Child had injured his left femur. *Id.* Ms. Wallace immediately investigated the report by interviewing Mother and Father. *Id.* at 66-67. At first, Mother stated that she picked Child up from Child's bed and placed Child on her own bed next to Father, and then she went into the bathroom. *Id.* at 67. Mother stated that Child was whining and fussing, but nothing unusual. *Id.* Next, Ms. Wallace interviewed Father at the hospital. *Id.* at 67, 69. Ms. Wallace then interviewed Mother again. *Id.* at 67. At that point, Mother mentioned that Child's legs were intertwined in the slats of the bed, but she did not mention that Child was throwing a tantrum. *Id.* Mother stated that, after Child continued to cry, she took him upstairs to Maternal Grandmother. *Id.* at 67-

68. Mother also stated that, when Maternal Grandmother touched Child's leg, Child's crying increased. *Id.* at 68-69.

Mother consistently stated to Ms. Wallace that she was the person who caused Child to cry. *Id.* at 69. Initially, Mother stated she picked up Child and put him on her bed, and, in her second version, Mother stated she picked up Child off his own bed, and that his leg was intertwined in the slats of the footboard. *Id.*

Father stated to Ms. Wallace that Mother put Child on their bed, put a towel next to Child on the bed, and Mother went into the bathroom. *Id.* Father did not mention that Child's legs were intertwined with Child's own bed. *Id.* Father said that Child was whining and thought Child was hungry, but he did not mention that Child was throwing a tantrum. *Id.* at 69-70. Father stated he became aware something was wrong when Mother took Child upstairs to Maternal Grandmother, and Child's crying increased. *Id.* at 70.

Ms. Wallace saw Child at the hospital. *Id.* Child, who was twenty-two months old, was unable to speak. *Id.* After interviewing Parents, Ms. Wallace was concerned for Child's safety. *Id.* at 71. Parents did not indicate any other caregivers for Child. *Id.* DHS placed Child under a Safety Plan with Paternal Uncle. *Id.* When Paternal Uncle could not care for Child, DHS obtained an OPC and placed Child in general foster care. *Id.*

On May 6, 2020, four days after the injury event, Ms. Wallace met with Mother in Mother's home and interviewed Mother's four-year-old child, J.B.

*Id.* at 71-72. Ms. Wallace made a video recording of Mother re-enacting what happened during the incident with Child. *Id.* at 71-72. J.B. did not provide any information about how Child was injured and did not recall the event. *Id.* at 72. As Ms. Wallace made the re-enactment video, Mother showed how she picked Child up from the bed, stating that his leg was intertwined with the slats in his bed, and that Child threw a tantrum. *Id.* at 73. This was the first time that Mother mentioned Child's tantrum. *Id.*

Ms. Wallace did not discuss the situation directly with Dr. Atkinson but read Dr. Atkinson's report. *Id.* Based on her own investigation and Dr. Atkinson's notes, Ms. Wallace had concerns about Child's safety in the care of Parents, particularly that he had a serious injury and Parents were unable to fully explain what happened. *Id.* at 74-75. Ms. Wallace found the May 4, 2020 Child Protective Services ("CPS") report "indicated." *Id.* at 75. The trial court admitted the May 4, CPS report into evidence as for the limited purpose of providing that Ms. Wallace testified that there was a CPS report that was indicated. *Id.* at 78.

Ms. Wallace recommended Child should be fully committed to DHS, Parents should complete parenting classes, and Mother should undergo a mental health evaluation. *Id.* at 78-79. During Ms. Wallace's interview, Mother denied having any mental health issues. *Id.* at 79. Ms. Wallace subsequently learned through Community Behavioral Health ("CBH") that Mother had been previously involved with two mental health facilities, but Ms.

Wallace was unable to contact those facilities to learn why Mother went there. *Id.* at 79-80. When Ms. Wallace questioned Mother, Mother stated she had gone to one facility for therapy because her father had recently died and the other to obtain sleeping pills. *Id.* at 80. Mother did not have an explanation for failing to previously disclose this information to Ms. Wallace. *Id.* at 81.

On cross-examination by GAL/legal interests counsel for Child, Ms. Wallace stated she first interviewed Mother in Child's hospital room at St. Christopher's on May 4, 2020, two days after the incident occurred, after Child had been transferred from Aria Health Hospital and Medical Center ("Aria"), where his leg had been put in a cast. *Id.* at 82-83. Child was on the hospital bed and out of Ms. Wallace's sight. *Id.* at 83. Father was not present. *Id.* at 82. When Ms. Wallace was at Mother's home two days after the hospital interview, which was four days after the incident, Mother provided additional details about the incident. *Id.* at 84. Father was not present for the interview in the home. *Id.* Mother was cooperative and attentive during both interviews, had no difference in her demeanor, and did not appear to be avoiding any questions. *Id.* at 84-85.

On cross-examination by Mother's counsel, Ms. Wallace explained Parents and the Children live in the basement of Maternal Grandmother's home. *Id.* at 89-90. She observed only one exit or entrance to the home, which was on the first floor. *Id.* at 90. Ms. Wallace assessed the home as appropriate but determined Child could not safely stay there because Parents

could not provide any explanation for his injury. *Id.* Ms. Wallace believed Mother provided more detail about Child's injury during the reenactment video than during her initial interview at the hospital by choice, and also because the bed was present when Mother reenacted the injury. *Id.* at 90-91. Ms. Wallace observed the space between Parents' bed and Child's bed, but she was unable to comment on whether a child could have sufficient space to fall within the crack between the beds. *Id.* at 92. Ms. Wallace was unaware that Mother had begun parenting classes and completed a mental health evaluation. *Id.* at 92-93. While at the hospital, Ms. Wallace observed Mother pick up Child and hold him in normal interaction, and that was the only interaction she observed. *Id.* at 93.

Regarding Child's disposition and permanency, DHS presented the testimony of Taneisha Spain, the CUA case manager assigned to the case since May 22, 2020, when she made her initial visit with Mother in Mother's home. *Id.* at 96-97. She did not meet with Parents at the twenty-day meeting. *Id.* at 97. Mother was compliant with Ms. Spain throughout the case. *Id.* Mother's objectives were to obtain appropriate housing; obtain employment; attend parenting classes; and attend mental health therapy and get an evaluation. *Id.* Mother was scheduled to receive a certificate of completion of her parenting classes on August 26, 2020. *Id.* Mother was unemployed, and Ms. Spain was awaiting Mother's verification of unemployment. *Id.* Mother was in the process of obtaining housing and had

- 17 -

paid a deposit. *Id.* Mother was scheduled to move into the apartment with Father in September of 2020. *Id.*

At the time of the hearing, Ms. Spain had assessed Maternal Grandmother's basement, and she was concerned about Child's safety when living in the basement. *Id.* at 98. She found the upstairs of Maternal Grandmother's home appropriate for Child. *Id.* Ms. Spain was concerned for Child's safety in the basement because it is too small. *Id.* Also, she stated that, for safety reasons, Child needs a toddler bed with guardrails, and not a bunkbed from which he could roll off. *Id.* at 98-99. The bedroom has a door but there are cords and clutter, and unsafe things in the basement. *Id.* at 99. Moreover, in the summer of 2020, the basement flooded from a hard rain. *Id.* at 100.

Ms. Spain stated that Mother's supervised visits with Child were going well. *Id.* at 101. Ms. Spain stated that Mother has been compliant with the CUA. *Id.* at 102. Father has not been compliant, and, at times, he has been difficult to contact. *Id.* at 102. After Ms. Spain assumed the case on May 22, 2020, she was unable to contact Father, as he would not return her calls. *Id.* at 102-103. He returned her call on the day prior to the hearing with a text of his paystub. *Id.* at 103. Ms. Spain had requested proof of Father's employment, and she verified that Father is employed as a truck driver. *Id.*

On the initial visit on May 22, 2020, Mother told Ms. Spain that Father was not home; however, Mother subsequently told Ms. Spain that Father had

been in the basement the entire time. *Id.* Mother did not explain why she had said Father was not home. *Id.* Father's visits with Child began with a virtual visit on July 13, 2020. *Id.* at 104. Prior to the hearing, he had four or five visits. *Id.* at 104. Ms. Spain's case aide reported that Father will visit for only ten minutes. *Id.* On August 10, 2020, Father had an in-person visit with Child when Child was having bloodwork done at St. Christopher's. *Id.* On the following day, August 11, 2020, Foster Parents, T.M. and E.M., e-mailed Ms. Spain and informed her that, when Child woke up in the morning, he had removed his disposable diaper and shorts, and had urinated all over the bed. *Id.* at 104-105. This was unusual behavior in the time Child had lived with Foster Parents. *Id.* at 105. Regarding Foster Parents' e-mail, Ms. Spain's case aide explained to Ms. Spain that Child engaged with Father only when Child was sitting on Mother's lap. *Id.* When Father attempted to pick up Child, Child did not want Father to pick him up. *Id.*

Ms. Spain recommended that Father complete parenting classes and be referred for a mental health evaluation, because neither parent would explain Child's injury, and because of Father's lack of communication with the CUA. *Id.* at 105-106. Ms. Spain recommended Child remain in placement with Foster Parents, where he is doing well. *Id.* at 106-107.

On August 11, 2020, when Ms. Spain assessed (virtually) Child's safety in the foster home, Child was safe, and Foster Parents were meeting his basic needs. *Id.* The foster home was certified through Turning Points. *Id.* Child

was current on his medical appointments. *Id.* Child's femur injury was making good progress in healing. *Id.* at 108. Child was receiving services through ChildLink. *Id.* He had a special instructive therapist and a physical therapist, who reported to the CUA that Child was doing well. *Id.* Child was not in daycare. *Id.*

After the close of the evidence on August 25, 2020, the trial court entered an order finding that Child was doing well, his medical care was up-to-date, and he was safe as of a virtual safety check on August 11, 2020. Child remained placed in foster care through the CUA. The trial court further ordered the temporary commitment of Child at Foster Parents' home to continue and for prior orders to stand, with a provision that visits may be modified by agreement of the parties. The court continued the hearing to October 22, 2020.

At the hearing October 22, 2020, Mother testified on her own behalf. N.T., 10/22/20, at 7. DHS then presented the testimony of Ms. Spain (*id.* at 60); and Jahniya Wesley, a CUA case aide who supervised the visits between Parents and Child (*id.* at 68). Mother's counsel then questioned Virginia Boykin, who is Mother's outpatient psychotherapist through Best Behavioral Healthcare ("Best Behavioral"). *Id.* at 79.

Mother stated it was dark in the bedroom, with the only light coming from a television. N.T., 10/22/20, at 12. Mother testified she pulled Child up as she had done in the past, but she was not aware until afterwards that

perhaps Child's legs were locked down in the footboard slats. *Id.* She believes that is how Child's injury occurred. *Id.* Mother denied she was upset with Child at the time of Child's injury. *Id.* Mother testified that, when she picked up Child, he threw his body back and started to throw a tantrum. *Id.* at 13.

Mother testified that she believed Child was throwing a tantrum because she was not allowing him to climb across the beds; she did not believe Child was hurt. *Id.* at 13. Mother stated she began thinking that Child could have gotten hurt doing a somersault or a tumble in a very quick motion in the gap between the beds. *Id.* Prior to Child's injury, Mother was Child's primary caregiver. *Id.* Father also was a caregiver for Child. *Id.* at 13-14.

At the time of the incident, neither Father nor Mother was working because of the COVID-19 pandemic. *Id.* at 14. Child was current with his medical appointments. *Id.* at 14; Exh. M-1. Immediately prior to Child's injury, Child was enrolled in pre-school. *Id.* at 14; Exh. M-5. At the time of the injury, the pre-school was closed because of the COVID-19 pandemic. *Id.* at 14. Prior to the pandemic, Mother had worked as a certified nursing assistant. *Id.* at 14-15; Exh. M-4.

Mother completed parenting classes on August 25, 2020. N.T., 10/22/20, at 15. Regarding her housing objective, Mother moved to Cheltenham, a nice community with great schools for the Children. *Id.* at 15-16. Regarding her mental health objective, Mother testified she had a mental health evaluation in June of 2020. *Id.* at 16. She saw the psychiatrist

and was having ongoing mental therapy. *Id.* at 16. Mother was diagnosed with mild depression, and she was not prescribed medication. *Id.* at 16-17. Mother has mental therapy for emotional support. *Id.* at 17.

Mother participated in every physicians' appointment and every visit with Child, both virtual and in-person. *Id.* Mother testified that, after having virtual visits with Child, Child is now confused with in-person visits with Mother, and he becomes tense, but he knows who she is. *Id.* Mother asks Child for hugs and allows Child to hug her on his own. *Id.* at 18. Mother and Child have fun in the playroom at visits. *Id.* at 18. Mother would like to see Child more often. *Id.* In her new apartment, Mother has a "car" bed for Child, which is lower than the bunkbed. *Id.* at 18-19. In Maternal Grandmother's basement, Mother had the bunkbed for the Children because of the tight space in the basement. *Id.* at 19. At the time of Child's injury, Mother had been in the bathroom for less than a minute. *Id.* She did not believe anything happened to Child while she was in the bathroom. *Id.* 19-20.

On cross-examination by counsel for DHS, Mother stated she assumed that nothing could have happened to Child while she was in the bathroom, as she did not hear Child cry out. *Id.* at 20-21. Mother tried pulling Child up when his legs were between the slats of the bed just once, and it was a quick motion. *Id.* at 21. Mother believes that Child was injured when she pulled him and tried to lift him up. *Id.* Mother stated to the staff at Aria that Child was on the bed with Father when she went into the bathroom, which is

separated from the bedroom by a door.  *Id.* at 22.  She reported to Aria staff that when she came out of the bathroom, Child was still on the bed, but he was crying and guarding his leg.  *Id.* at 23.

At St. Christopher's, Mother stated that she got up to use the bathroom, and she picked up Child and carried him from his bed to her bed.  *Id.*  Mother told the staff that she was in the bathroom no longer than two and a half seconds.  *Id.* at 23-24.  At the hearing, Mother denied she could have used the bathroom so quickly.  *Id.*  Mother testified that she had reported to St. Christopher's staff that Child was throwing a tantrum when she returned from the bathroom, and she stated that a tantrum includes whining.  *Id.* at 24.  Mother reported to St. Christopher's staff that Child's legs were intertwined in the slats of his bed, and possibly became twisted when she carried Child from his bed to her bed.  *Id.*  Mother testified that, after she came out of the bathroom, Child screamed out when she picked him up, and any movements of his leg made him cry.  *Id.* at 25.  Prior to coming out of the bathroom, Child was throwing a tantrum when Mother moved him from his bed to her bed, and Mother thought it was because she would not allow him to go between the beds by himself.  *Id.*  Mother reported that when she came out of the bathroom and picked up Child, he cried out, and Mother suspected something was wrong.  *Id.*  When she picked up Child and started checking his body, he cried out in pain, so that is why she took him to the hospital.  *Id.* at 27-28.

Mother stated that she has been seeing her mental health therapist, Ms. Boykin, since after Child's injury. *Id.* at 28. Mother had a mental health evaluation conducted by a psychiatrist, Dr. Mahlab, but Mother did not speak about Child's injury and how it happened. *Id.* at 28-30. In her therapy sessions, Mother discusses what is bothering her that day. *Id.* at 30.

On cross-examination by the GAL/legal interests counsel for Child, Mother testified that the beds were only a few feet apart, and that the bathroom was inside of her bedroom, but she could not see Child. *Id.* at 30-31. Mother stated that Child was attempting to get from his bed to her bed, and that his legs were between the slats of his bed. *Id.* at 31-32. Mother acknowledged that, to get out of his own bed, Child would have had to remove his legs from between the slats. *Id.* at 33. Mother testified that before she picked up Child, she had noticed Child's legs were between the slats of his bed, but she did not move them, and just pushed him back and picked him up. *Id.* at 33-34. When asked whether she used due diligence in ensuring Child's safety in lifting Child out of his bed, Mother responded that she should have waited for his legs to get out of the slats, and that her need to use the bathroom might have caused her not to take the care she normally would have used with Child. *Id.* at 35. Father was napping while Mother was picking up Child. *Id.* at 35-36. Mother acknowledged that she did not tell the staff at Aria that Child's legs were intertwined with the slats in his bed. *Id.* She explained that she did not tell them this information because she was shocked

and overwhelmed, and trying to figure out what was wrong with Child. *Id.* at 36.

DHS again presented the testimony of Ms. Spain regarding Child's disposition and permanency. *Id.* at 60. Ms. Spain testified that, when she last virtually assessed Child in his general foster care home on October 6, 2020, Foster Parents were meeting his basic needs. *Id.* at 60-61. Child was current with his medical and dental appointments, and he did not need anything. *Id.* at 61. Ms. Spain testified that Child was developmentally on target for all ages and stages. *Id.*

In response to cross-examination by Mother's counsel, Ms. Spain testified that she had not yet conducted family finding because Mother had no family member that the CUA could verify as a placement resource. *Id.* at 63-64. Ms. Spain agreed that family finding is a process that the CUA does when a child is in care with a non-family member, and that kinship placement would be a least restrictive placement for Child. *Id.* At the time of the hearing, Child had been in placement with non-family members since the end of May 2020, for five months. *Id.* at 64-65. Ms. Spain had not explored any placement resource in aunts, uncles, cousins, or neighbors. *Id.* at 65.

Ms. Spain visited Mother's new home, and testified that it was safe and appropriate, and had bedding for Child. *Id.* Ms. Spain verified Mother is participating in mental health therapy and completed parenting classes. *Id.* Mother's remaining objectives consisted of obtaining appropriate housing,

obtaining stable employment or proof of unemployment, undergoing mental health therapy, and attending supervised visits at the Agency. *Id.* Mother had not submitted proof of her unemployment. *Id.* at 65-66. Ms. Spain testified the barrier to reunification between Mother and Child was the need for more supervised visits at the CUA for the safety of Child. *Id.* at 66. Ms. Spain stated that Child is not seeing Parents every day, and more monitoring for Child's safety in Parents' presence needs to occur before Mother and Child can be safely reunified. *Id.* at 66-67.

Next, regarding Child's disposition and permanency, DHS presented the testimony of Jahniya Wesley, a CUA case aide who supervised visits between Parents and Child beginning in September of 2020. *Id.* at 68. At the beginning of the supervised visits, Child cries as he is coming into the building, for a reason unknown to Ms. Wesley, but stops crying once he is in the visitation room. *Id.* at 69. When Child arrives at the visits, he holds onto his foster parent's fingers. *Id.* On more than one occasion, as Child and Foster Parents were coming in the door, Child has latched onto his foster parent's leg and cried. *Id.* at 69-70. At the first in-person visit, Child cried for approximately five minutes, but, subsequently, he has not cried for as long a period when he comes to visit and enters the visitation room. *Id.* at 70. Ms. Wesley testified that Parents are appropriate with Child at the supervised visits. *Id.* at 70-71. Ms. Wesley recommended that the supervised visits should occur more than once a week, and that the time of the visit should be

increased to two hours. *Id.* The reason for her recommendation was that Child cries when he starts the visits, but he is happy during the visits. *Id.* at 72. She agreed that having visits twice a week could help Child to get past his initial fear at the beginning of the visits. *Id.* Ms. Wesley testified that the visits between Child and Father go well, and Father engages with Child. *Id.* at 73. Mother engages with Child more than Father engages with him. *Id.* Ms. Wesley recommended that Child would likely benefit from separate visits with Mother and Father. *Id.* at 73-74. In response to questioning by the trial court, Ms. Wesley stated there was no reason why Child could not have daily or frequent virtual visits with Mother and Father. *Id.* at 74.

Next, Mother's counsel presented the testimony of Mother's psychotherapist, Ms. Boykin, who holds a master's degree in psychology/counseling. *Id.* at 79. She has worked as a counselor for a total of fifteen years, two and a half those years at Best Behavioral. *Id.* at 79-80. Ms. Boykin concentrates her practice on trauma-focused and family therapy, and parent interaction. *Id.* at 80. Ms. Boykin testified that Mother is diagnosed as having persistent depressive disorder. *Id.* Ms. Boykin stated that, on June 3, 2020, Mother's psychiatrist diagnosed her as having post-traumatic stress disorder ("PTSD"), because of Mother's previous trauma, but that diagnosis has now been ruled out. *Id.* Mother's persistent depression means that Mother has mild depression, which would include symptoms such as poor appetite, difficulty sleeping at night, and an

inconsistent irritable mood that could last a week at a time or three months. *Id.* at 80-81. Mother does not require medication. *Id.* at 81. Mother is doing very well working with concentration and coping skills in dealing with the loss of Child from her home, and she is showing great progress. *Id.* Ms. Boykin continues to work on coping skills and cognitive behavioral therapy with Mother, giving Mother positive affirmations about herself, making her feel strong, and having her do volunteer work to prevent Mother from having negative thoughts. *Id.* at 81-82. Mother has been consistent in therapy and has requested additional therapy to keep on track and positive. *Id.* at 82. Ms. Boykin has no concerns about Mother's temper. *Id.* Mother is very calm in her sessions, which last forty-five minutes to an hour. *Id.* Ms. Boykin assesses Mother as a very sweet individual who is eager to be reunified with the Children. *Id.* Since June 3, 2020, Ms. Boykin has not seen Mother in an irritable mood or with poor concentration; rather, Mother stays focused. *Id.*

At the conclusion of the hearing, the trial court found that DHS had sustained its burden of proving the allegations set forth in the dependency petition, and it found those allegations as facts. *See* Order of Adjudication and Disposition, at 1. On the record, the trial court stated its basis for its adjudicating Child dependent and finding Mother, alone, committed child abuse, as follows:

> THE COURT: Thank you all. It's this [c]ourt's finding that [DHS] has presented clear and convincing evidence in this case.

- 28 -

I do find that the actions of [M]other [were] reckless, and that she caused the injury through the force of removing [Child] from his bed. I do find child abuse, but as to [M]other only.

The child will be adjudicated dependent and committed to [DHS][;] however, visits should be more frequent than – I believe the testimony was that it's only once a week.

I do want to commend the parents for taking the steps to follow through with trying to find appropriate housing.

And, [M]other, I ask that you continue with the therapy that you're having with Ms. Boykin, or whatever appropriate provider. And, to the extent possible, reunification hopefully will occur shortly.

N.T., 10/22/20, at 58 (lines 21-25, p. 59 lines 1-14).

The trial court stated the following as to its disposition of Child:

Family finding forthwith, virtual visits three times weekly, in-person visits twice weekly. The therapist is to receive the dependency petition. BHS is to monitor therapy. Best Behavioral is to provide a treatment plan and progress report.

Mother to continue with therapy at Best Behavioral, and if appropriate, a referral shall be made for either Best Behavioral or elsewhere for healthy relationships.

* * *

[Visits] [m]odifiable by agreement.

**COURT CLERK:** So, you've got modified to twice weekly supervised, and along with three times virtual (inaudible)?

**THE COURT:** I'm ordering three times weekly for virtual, in-person twice weekly –

**COURT CLERK:** Right.

**THE COURT:** -- modifiable by agreement.

* * *

**COURT CLERK:** -- child abuse and aggravated circumstances or just –

\* \* \*

**COURT CLERK:** Both?

**THE COURT:** Yes, as to mom.

**[CHILD'S COUNSEL]:** But Your Honor is ordering reasonable efforts to be -- for reunification, correct?

**THE COURT:** Correct. We're working towards –

**[CHILD'S COUNSEL]:** Thank you.

**THE COURT:** -- reunification.

Notwithstanding that finding, we're working towards reunification. The visits are to increase from what I've ordered, by agreement of the parties, and we're going to bring it back for a shorter date than normal. Stand by for a court date.

*Id.* at 96-98.

In the October 22, 2020, adjudication and disposition/abuse order, the trial court adjudicated Child a dependent pursuant to 42 Pa.C.S. § 6302(1), stating that it found DHS proved the facts set forth in the dependency/abuse petition and removal of Child from Parents' home was in Child's best interest. The trial court found that allowing Child to remain in the home would be contrary to Child's welfare, and DHS made reasonable efforts to prevent or eliminate the need for removal of Child from the home. The trial court put Child in the legal custody and physical custody of DHS, with placement in foster care through Turning Points, where he was safe as of October 6, 2020. The visitation between Child and Parents was modified from weekly

supervised, as arranged, to twice weekly supervised, as arranged, and three times weekly virtual communication. The order directed family finding for Child to continue. Additionally, the order found Child was doing well, and received special instruction through ChildLink. The court found DHS made reasonable efforts to locate and serve Parents, who both participated via video conference. The court also found Mother completed a parenting class, complying with DHS/CUA Turning Points. Moreover, the trial court found that abuse, 23 Pa.C.S. § 6303(b.1)(1), existed as to Mother only.

The court further discharged Child's temporary commitment to DHS and ordered Child's full commitment to DHS. The court directed DHS/CUA Turning Points to provide Mother's therapist with the dependency petition regarding Child. The court referred Mother and Child to BHS ("Behavioral Health Services") for monitoring. The court ordered a full progress report/treatment plan for Mother to be provided for the next court date, as well as a single case plan meeting to occur.

In a separate order entered on October 22, 2020, the trial court found aggravated circumstances existed as to Mother. In a *sua sponte* order entered on October 27, 2020, the trial court ordered the CUA to assist Mother with employment, including but not limited to, an ARC ("Achieving Reunification Center") referral for employment.

On November 19, 2020, Mother timely filed a notice of appeal from the October 22, 2020 adjudication and disposition/abuse order, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother raises the following issues:

1. Did the trial court err as a matter of law and abuse its discretion by entering a finding of child abuse against Mother when insufficient evidence was introduced to demonstrate that Mother intentionally, knowingly, or recklessly caused or created a reasonable likelihood of bodily injury to L.B. through a recent act or failure to act?

2. Did the trial court err as a matter of law and abuse its discretion by entering a finding of child abuse against Mother in the absence of clear and convincing evidence that L.B.'s injury was "child abuse" as defined pursuant to 23 Pa.C.S. § 6303(b.1)?

3. Did the trial court err as a matter of law and abuse its discretion if it applied 23 Pa.C.S. § 6381(d) to presume Mother responsible for L.B.'s injury in the absence of clear and convincing evidence that L.B.'s injury was the result of abuse?

4. Did the trial court err as a matter of law and abuse its discretion by adjudicating L.B. to be a "dependent child" pursuant to 42 Pa.C.S. § 6302 in the absence of clear and convincing evidence that L.B. was "without proper parental care and control. . . as required by law"?

5. Did the trial court err as a matter of law and abuse its discretion by committing L.B. to the legal custody of the Department of Human Services in the absence of evidence that removal was clearly necessary?

Mother's Brief, at 3-4.[4]

_____

[4] The Juvenile Act defines aggravated circumstances as follows, in relevant part.

*(Footnote Continued Next Page)*

Mother argues:

> The trial court abused its discretion and erred as a matter of law by finding that Mother is a perpetrator of child abuse, that L.B. is without proper parental care and control, and that L.B. must be removed from the custody of Mother.

---

> "**Aggravated circumstances.**" Any of the following circumstances:
>
> * * *
>
> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.
>
> * * *

42 Pa.C.S. 6302. The Juvenile Act defines "aggravated physical neglect" as "[a]ny omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." *Id.* The Juvenile Act defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ."

As Mother has not appealed the aggravated circumstances order and she did not challenge the finding of aggravated circumstances in her concise statement and statement of questions involved in her brief on appeal, she waived any challenges to that order. *See Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that any issue not set forth in or suggested by an appellate brief's statement of questions involved is deemed waived). Had Mother preserved a challenge to the aggravated circumstances order, we would view the trial court's finding of aggravated circumstances as to Mother supported by the competent evidence in the record, as the trial court found she inflicted serious bodily injury on Child when she broke his femur, which caused an impairment of his bodily member. *See In re L.V.,* 127 A.3d 831, 838-839 (Pa. Super. 2015) (holding that aggravated circumstances existed where the father inflicted serious bodily injury on the child, and the mother engaged in aggravated physical neglect in failing to protect the child from the father, and in failing to seek medical attention for the child's fractured ribs).

The trial court credited Mother's explanation for the Child's injury, but found that Mother's actions when she pulled her son from his bed were reckless. The trial court erred because there was insufficient evidence that Mother consciously disregarded a substantial risk of injury to her son. Mother was not aware that her son's legs were caught in the bedframe. She lifted him with a quick movement, using the same motion to lift him that she had used many times before. Her actions did not grossly deviate from that of a reasonable person in the same situation.

Mother's actions were not abuse because they meet two enumerated exclusions from the definition of child abuse in the CPSL. [] Child was attempting to climb from his bed to his parents' bed, and Mother feared that he would fall in the gap between them. Mother's quick actions as a parent to protect, control and supervise her child are excluded from child abuse.

The trial court also erred by adjudicating L.B. to be a dependent child because insufficient evidence was presented that he was presently without proper parental care and control. The finding of abuse against Mother cannot support an adjudication of dependency because it was not supported by the record. Without clear and convincing evidence that a parental incapacity is currently present, and will likely continue, it was error to find that L.B. is a dependent child.

Finally, even if L.B. was properly adjudicated to be a dependent child, the trial court erred by removing L.B. from the custody of Mother in the absence of clear and convincing evidence that removal was clearly necessary. No evidence was presented to explain why [] Mother and Child, already separated for close to six months, should continue to be separated. Because L.B.'s removal was not supported by clear necessity, it was contrary to law.

Mother's Brief, at 12-14.

We consider Mother's first three issues together. She argues that the trial court's finding of child abuse was not supported by sufficient evidence to satisfy the definition of abuse set forth in 23 Pa.C.S. § 6303(b.1), and 18

Pa.C.S. § 302 (defining reckless actions), and the court's reliance on the statutory presumption, 23 Pa.C.S. § 6381(d), for the identity of the abuser as Mother is inappropriate. She contends there was no clear and convincing evidence that L.B.'s injury was the result of abuse, but, rather, fell into the statutory exceptions for preventing a child from injuring himself through self-inflicted physical harm, and for supervision control, and discipline of Child with reasonable force. 23 Pa.C.S. § 6304(c)(2)(ii), and (d). In her fourth issue, Mother contends that the trial court erred and abused its discretion in finding Child a dependent child pursuant to 42 Pa.C.S. § 6302(1). In her fifth issue, she argues that the trial court erred and abused its discretion in removing Child from her care and custody and placing Child in the care and custody of DHS under 42 Pa.C.S. § 6351.

Our standard of review in dependency appeals is as follows.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

A "dependent child," as defined in relevant part in the Juvenile Act, 42 Pa.C.S. §6302, is a child who:

> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals.

A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk. . . .

42 Pa.C.S. § 6302(1).

This Court has explained:

Dependency proceedings concern themselves with the correction of situations in which children are lacking proper parental care or control. A dependent child is one who "is without proper parental care or control . . . necessary for his physical, mental, or emotional health. . . ." 42 Pa.C.S.A. § 6302. Whether a child is lacking proper parental care and control encompasses two discrete questions: (1) Is the child at this moment without proper parental care or control? and (2) If so, is such care and control immediately available? The burden of proof in a dependency proceeding is on the petitioner . . . who must show [that] the juvenile is without proper parental care, and that such care is not available immediately. Both of these determinations must be supported by clear and convincing evidence. Such a conclusion requires that testimony be so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

A finding of abuse may support an adjudication of dependency. When the court's adjudication of dependency is premised upon physical abuse, its finding of abuse must be supported by clear and convincing evidence. However, its findings as to the identity of the abusers need only be established by prima facie evidence that the abuse normally would not have occurred except by reason of acts or omissions of the caretakers (parents).

*In re C.R.S.*, 696 A.2d 840, 842-843 (Pa. Super. 1997) (quotations and

citations omitted).

We have stated that the Child Protective Services Law ("CPSL") "controls

determinations regarding findings of child abuse, which the juvenile courts

must find by clear and convincing evidence." ***In re L.V.***, 209 A.3d 399, 417 (Pa. Super. 2019) (citations omitted). "Clear and convincing evidence" requires:

> that the witnesses must be found to be credible; that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order; and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted provided it carries a clear conviction to the mind or carries a clear conviction of its truth.

***In the Interest of J.M.***, 166 A.3d 408, 423 (Pa. Super. 2017) (citing ***In re Novosielski***, 992 A.2d 89, 107 (Pa. 2010) (citations and internal brackets omitted)).

Section 6303 of the CPSL defines "child abuse" as follows, in relevant part.

> **§ 6303. Definitions.**
>
> . . .
>
> **(b.1)** *Child abuse.* — The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
>> (1) Causing bodily injury to a child through any recent act or failure to act.

23 Pa.C.S. § 6303(b.1)(1). "Bodily injury" is defined as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S. § 6303(a).

The CPSL refers to 18 Pa.C.S. § 302 with respect to the definitions of intentionally, knowingly, and recklessly. 18 Pa.C.S. § 302(b) provides as follows:

(1) A person acts intentionally with respect to a material element of an offense when:

> (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

> (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

(2) A person acts knowingly with respect to a material element of an offense when:

> (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

> (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b).

Our Supreme Court has stated that the identity of the perpetrator of child abuse "need only be established through *prima facie* evidence in certain situations." *In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015). *Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain

sufficient." ***Id.*** at 1184 (citing *Black's Law Dictionary* at 825 (6th ed. abridged 1991)). Section 6381(d) of the CPSL provides:

> **§ 6381. Evidence in court proceedings.**
>
> . . .
>
> **(d)** *Prima facie evidence of abuse.* ― Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S. § 6381(d). The ***L.Z.*** Court held:

> [E]vidence that a child suffered injury that would not ordinarily be sustained but for the acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse unless the parent or responsible person rebuts the presumption. The parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by the CYS agency and the rebuttal of the parent or responsible person.

***In re L.Z.***, 111 A.3d at 1185 (footnote omitted).

After a careful review of the evidence, we find sufficient, clear and convincing evidence in the record for the trial court to reach its conclusions in the October 22, 2020 adjudication/disposition/abuse order. There was sufficient evidence from which the trial court could have properly concluded, with or without an application of the *prima facie* evidence statute at 23 Pa.C.S.

§ 6381(d), that Mother injured Child through her act of lifting Child from his bed. Mother testified that she was Child's primary caregiver prior to Child's injury and was responsible for lifting Child at the time of his injury, that there was no other caregiver involved, and that Father had been napping at the time of Child's injury. Additionally, applying the *prima facie* evidence statute, Dr. Atkinson testified that Child suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child, particularly Mother, in that his femur injury would have taken a considerable amount of force, and would not have happened accidentally. 23 Pa.C.S. § 6381(d).

Further, there was clear and convincing evidence upon which the trial court could have concluded that Mother acted recklessly. **See** 18 Pa.C.S. § 302(b)(3). The evidence in the record supports a finding that, when Mother was lifting Child at the time of his injury, she acted in conscious disregard of a substantial and unjustifiable risk that an injury to Child's leg existed or would result from her conduct. Mother admitted that she was moving Child in a dark room, that he was throwing a tantrum, and that his leg was intertwined in the slats in the footboard of his bed. Moreover, the evidence supports a finding that the manner in which Mother lifted Child up from his bed with his leg stuck in the slats of the footboard involved a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

Mother acknowledged in her testimony that Child was crying and throwing a tantrum when she lifted him from his bed. Father testified that Child was crying and whining the entire time, not just after Mother returned from the bathroom, as Mother had initially reported to hospital staff at St. Christopher's.

Mother conceded on cross-examination by the GAL/legal interests counsel for Child that Child would not have been injured if she had exercised due diligence in lifting him from his bed and had not had urgency to use the bathroom. According to Dr. Atkinson's testimony, Child's femur injury would not ordinarily be sustained but for the acts or omissions of the parent or other responsible person. Dr. Atkinson testified that Child's injury could not have happened in an accidental manner and would have required a significant amount of force to break his femur, causing him to cry out in pain. Dr. Atkinson was also concerned that Child was throwing a tantrum during the event, and so Mother potentially used excessive force out of frustration when she was trying to remove Child from his bed. In Dr. Atkinson's expert opinion, a parent or caregiver, particularly Mother, would have used excessive force in lifting Child from his bed, and would have known that Child was injured; thus, Mother minimized Child's injury, or else Mother misrepresented the manner in which Child sustained the femur break. *See In re L.Z.*, 111 A.3d at 1185.

Dr. Atkinson testified that the injury would have caused Child substantial pain and impaired his ability to walk. Thus, there was clear and convincing

evidence, believed by the trial court, that Child's broken femur was a bodily injury, as he sustained an "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S. § 6303(a).

Thus, we find that there was sufficient, clear and convincing evidence from which the trial court concluded that Mother committed child abuse because she recklessly caused bodily injury to Child by her action of lifting him from his bed while his legs were locked in the footboard of his bed, and while he was throwing a tantrum, which caused Child to sustain a break to his femur, a bodily injury, from which he had an impairment of his physical condition or substantial pain. 23 Pa.C.S. § 6303(a), (b.1)(1); 18 Pa.C.S. 302(b)(3).

Mother contends that her action of lifting Child from his bed was done to prevent Child from injuring himself, and that this act would fall within the exception to child abuse set forth in section 6304 of the CPSL. Section 6304 provides exceptions for child abuse, as follows:

> (c) Use of force for supervision, control and safety purposes.-- Subject to subsection (d), the use of reasonable force on or against a child by the child's own parent or person responsible for the child's welfare shall not be considered child abuse if any of the following conditions apply:
>
> > (1) The use of reasonable force constitutes incidental, minor or reasonable physical contact with the child or other actions that are designed to maintain order and control.
> >
> > (2) The use of reasonable force is necessary:
> >
> > > (i) to quell a disturbance or remove the child from the scene of a disturbance that threatens physical injury to persons or damage to property;

(ii) to prevent the child from self-inflicted physical harm;

(iii) for self-defense or the defense of another individual; or

(iv) to obtain possession of weapons or other dangerous objects or controlled substances or paraphernalia that are on the child or within the control of the child.

(d) Rights of parents.--Nothing in this chapter shall be construed to restrict the generally recognized existing rights of parents to use reasonable force on or against their children for the purposes of supervision, control and discipline of their children. Such reasonable force shall not constitute child abuse.

23 Pa.C.S. § 6304.

To the extent that Mother argues she testified that she moved Child from his bed to her bed for purposes of supervision, control, and discipline, and/or she feared he could fall into the one-foot gap between the beds, the trial court rejected her argument as not credible, given Mother's other testimony at the hearing on October 22, 2020. Mother acknowledged on cross-examination by the GAL/legal interests counsel for Child that Child would have had to remove his feet from the slats in the footboard of his bed prior to his being able to move off of his bed by somersault or otherwise. Additionally, Mother testified during that same cross-examination that she did not use due diligence in ensuring Child's safety when she picked up Child out of his bed, as she should have waited for his legs to get out of the slats. She also conceded that her urgency to use the bathroom might have caused her not to take the care she normally would have used with Child. This

acknowledgement was sufficient for the trial court to reject Mother's contention that she acted for Child's safety under the exceptions at section 6304(c)(2)(ii) of the CPSL. Moreover, Dr. Atkinson's testimony that Mother used excessive force supports the trial court's refusal to find that Mother used reasonable force for supervision, control, and discipline of Child under the exception at section 6304(d) of the CPSL.

Further, as to whether Child is dependent, the testimony at the hearings, especially that of Dr. Atkinson, which the trial court found credible, was sufficient, clear and convincing evidence for the trial court to find Child was without proper parental care or control, and such care and control was not immediately available. *In re C.R.S.*, 696 A.2d 840, 842-843; Pa.C.S. § 6302. Dr. Atkinson testified that, in her expert opinion, Child would not have sustained his injury but for the acts and omissions of his caregivers, N.T., 8/25/20, at 29, and that if the injury were sustained in pulling Child out of the bunkbed, there was a degree of force used beyond normal parenting of a twenty-two month-old child. *Id.* at 30-32. Dr. Atkinson opined that the amount of force a caregiver would have used for the injury to have occurred as Mother described was excessive, and that the caregiver should have noticed the symptoms at the time that Child's leg was injured. Further, Dr. Atkinson was troubled that Parents did not state that Child had been throwing a tantrum until several days after he was injured. As such, the trial court did not abuse its discretion in adjudicating Child a dependent child.

Finally, Mother challenges the removal of Child from her care and custody and the placement of Child in the care and custody of DHS. With regard to the disposition of a dependent child, in **In re D.A.**, 801 A.2d 614 (Pa. Super. 2002), this Court explained:

> A court is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

*Id.* at 617.

Section 6351(e) of the Juvenile Act provides, in pertinent part:

> **(e) Permanency hearings.—**
>
> (1) [t]he court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan in a manner appropriate to the child's age and maturity. If the court does not consult personally with the child, the court shall ensure that the views of the child regarding the permanency plan have been ascertained to the fullest extent possible and communicated to the court by the guardian ad litem under section 6311 (relating to guardian ad litem for child in court proceedings) or, as appropriate to the circumstances of the case by the child's counsel, the court-appointed special advocate or other person as designated by the court. . . .

42 Pa.C.S.A. § 6351(e).

Regarding the disposition of a dependent child, section 6351(e), (f), (f.1), and (g) of the Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

When considering a petition for goal change for a dependent child, the trial court considers:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007) (citing 42 Pa.C.S.A. § 6351(f)).

Section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal.

After the court has made a determination as to the appropriate placement goal, the court shall issue an order regarding "the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S.A. § 6351(g).

On the issue of a placement goal change, this Court has stated:

> When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. *See In re Sweeney*, 393 Pa. Super. 437, 574 A.2d 690, 691 (1990) (noting that "[o]nce a child is adjudicated dependent . . . the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." *In re E.F.V.*, 315 Pa. Super. 246, 461 A.2d 1263, 1267 (1983) (citation omitted).

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006).

At the hearing on August 25, 2020, Ms. Wallace recommended Child should be fully committed to DHS, Parents should complete parenting classes, and Mother should undergo a mental health evaluation. Upon questioning from the court, Ms. Wallace also recommended that Child should be adjudicated dependent, and that Parents should have supervised visits.

At the hearing on October 22, 2020, Ms. Spain testified that, when she last virtually assessed Child in his general foster care home on October 6, 2020, Foster Parents were meeting his basic needs. Child was current with his medical and dental appointments, and he did not need anything. Ms. Spain testified that Child was developmentally on target for all ages and stages. Child receives special instruction through ChildLink for his fine motor growth and skills, and he was doing well. Child was not in daycare at the time of the hearing.

Ms. Spain verified Mother is participating in mental health therapy and completed parenting classes. Ms. Spain had visited Mother's new home, and testified that it was safe and appropriate, and had bedding for Child. Mother's remaining objectives consisted of obtaining appropriate housing, obtaining stable employment or proof of unemployment, undergoing mental health therapy, and attending supervised visits at the Agency. Mother had not submitted proof of her unemployment. Ms. Spain testified the barrier to reunification between Mother and Child was the need for more supervised visits at the CUA for the safety of Child. Ms. Spain stated that Child is not seeing Parents every day, and more monitoring for Child's safety in Parents' presence needs to occur before Mother and Child can be safely reunified.

Ms. Wesley testified that Parents are appropriate with Child at the supervised visits. Ms. Wesley recommended that the supervised visits should occur more than once a week, and that the time of the visit should be increased to two hours. She could work with Parents on coordinating their schedules so visits can occur more than once a week. On cross-examination by GAL/legal interests counsel for Child, Ms. Wesley clarified that she was recommending that the supervised visits be increased in duration rather than to multiple times per week.

Based on the testimony of Ms. Spain and Ms. Wesley, there was sufficient evidence for the trial court to find removal of Child from Parents' home was in Child's best interest; that allowing Child to remain in the home

would be contrary to Child's welfare; and, that DHS made reasonable efforts to prevent or eliminate the need for removal of Child from Parents' home.

Moreover, Mother argues that DHS failed to demonstrate that there was a clear necessity to remove Child from the home of Parents. We have stated:

> The Juvenile Act has been interpreted to allow for the removal of a child from the custody of his parents only where there is clear necessity for such removal. Such necessity is implicated where the welfare of the child demands that he be taken from his parents' custody. We note that a decision to remove a child from his or her parents' custody must be reconciled with the "paramount purpose" of preserving family unity.

*In re A.L.*, 779 A.2d 1172, 1175 (Pa. Super. 2001) (citing *In re S.M.*, 614 A.2d 312, 314-315 (1992) (citations omitted)).

The Juvenile Act sets forth the following relevant purposes:

> **(b) Purposes.--**This chapter shall be interpreted and construed as to effectuate the following purposes:
>
> (1) To preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained.
>
> (1.1) To provide for the care, protection, safety and wholesome mental and physical development of children coming within the provisions of this chapter.

42 Pa.C.S. § 6301.

Initially, the trial court ordered Child removed from Parents' home because of concerns that Parents could not provide for Child's care, protection, safety, and wholesome mental and physical development. Neither Mother nor Father was a placement resource for Child because they had not been forthright with DHS in explaining how Child's femur was broken, and the

matter was being investigated as child abuse. At the time of the hearing on October 22, 2020, although Mother and Father had moved out of Maternal Grandmother's basement and rented an apartment of their own with a new, safer bed for Child, they continued to live together. We have concluded that the trial court's conclusion that Mother committed child abuse against Child is supported by competent evidence in the record. Accordingly, as Mother has been determined to have committed child abuse against Child, and Father resides with Mother, the trial court properly determined that there was a clear necessity to remove Child from Parents' care and custody, and to commit him to the custody of DHS. As such, the trial court did not abuse is discretion by placing Child in the legal custody and physical custody of DHS, setting Child's permanency goal as reunification with Parents. 42 Pa.C.S. § 6351(a); *In re K.C.*, 903 A.2d at 14-15.

After careful review, we conclude that the trial court did not abuse its discretion or commit an error of law in finding that Mother committed child abuse, finding Child dependent, and removing Child from Mother's care and custody, with a permanency goal of reunification with Parents. *See* 23 Pa.C.S. §6303(b.1); 23 Pa.C.S. §6381; 42 Pa.C.S. §6302; and 6351. Accordingly, we affirm the October 22, 2020 adjudication and disposition/abuse order.[5]

Order affirmed; Father's motion for correction of brief granted.

---

[5] We also grant Father's motion for correction of his brief, filed on March 8, 2021.

Judge Nichols joins.

President Judge Emeritus Stevens concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/7/21